## WYMAN *v.* BANVARD.

THE provisions of the amendatory School Land Act of April 22d, 1861, requiring that the proceeds of sales of the sixteenth and thirty-sixth sections shall constitute a State fund instead of being applied for the benefit of the townships in which the lands are situated, is constitutional and valid. It is not in violation of the grant made by Congress, nor, in requiring the interest upon previous sales made under the Act of 1858 to be transferred to the State fund, does it impair the obligation of a contract.

The School Land Act of 1858 is not a grant of the interest money to the several townships, but merely a provision as to the manner in which a certain fund shall be appropriated, and subject, therefore, to the future control of the Legislature.

APPEAL from the Eleventh Judicial District.

The complaint avers that under the Act of April 26th, 1858, providing for the sale of the State school lands, the sixteenth and thirty-sixth sections of certain townships of the surveyed public

lands of Placer County were, on the eleventh day of January, 1860, sold — the purchasers giving the bonds for payment as required by the act; that the defendant is the Treasurer of Placer County, and has in his hands five hundred and fifty-six dollars of interest money paid upon said sales; that the townships are organized school districts in which public schools are maintained; that the plaintiff is the assignee of certain warrants drawn by the School Superintendent upon defendant for the said interest money, on account of services rendered in the public schools in said townships, and that defendant refuses to pay the warrants.

Defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled, and plaintiff had judgment, from which the defendant appeals.

*A. S. Higgins,* for Appellant.

I.   The grant by the United States to the State of California, is not only a grant to the State, but it is specifically so, and not to any township, nor for the particular benefit of townships as such. The manner of its appropriation to the respective townships and school districts for the purposes of schools in each township is left to the State, and this State, as well as all others, has always by general laws determined the terms, conditions, and limitations under which the township appropriations shall be made, and townships as such cannot by any possibility secure any title to the lands, or to any of the proceeds from the sales of the same, except by State legislation—no grant having been made to them by the General Government.

II.   The law of 1858, referred to by respondent, does not grant —nor does it attempt to grant—the lands or the proceeds thereof to particular townships as such; but upon the other hand it only assumes to direct that the fund shall be set aside as a school fund, and the interest thereof appropriated to the support of common schools in the township.   It is not necessary that the " support " be given in the particular manner provided by the Act of 1858—it may as well be done in the manner provided by the Act of 1861; nor indeed could the Legislature, if they should so attempt, give

by absolute grant the land and its proceeds to the particular township where it is situated, for such an act would be clearly in violation of the conditions of its trust. They can only appropriate the fund to the general school purposes of the State, and not to particular localities.

*James Anderson*, for Respondent.

I.   The Act of the Legislature of California of April 22d, 1861 (Stat. 1861, 218), is violative of the trust created by the Act of Congress of March 3d, 1853. (Wood's Dig. 748, Secs. 6, 7.) The sixth section of this act provides " that all the public lands in the State of California, whether surveyed or unsurveyed, with the exceptions of Sections 16 and 36, which shall be and are hereby granted to the State for the purposes of public schools in each township." To make this language plain and ascertain from whence these Sections 16 and 36 are to come, we must fill up an ellipsis which occurs in this sentence of the grant. It will then read " all the public lands in the State of California, whether surveyed or unsurveyed, with the exception of Sections 16 and 36 (in each township), which shall be and are hereby granted to the State for the purposes of public schools in each township," etc. If anything is wanting to give further indication of the meaning of Congress as to the object of the grant it is found in Sec. 7, which, after stating that if in any of certain contingencies the sixteenth and thirty-sixth sections shall be preoccupied for private or public uses, other land shall be selected in, lieu thereof, agreeable to the provisions of the Act of Congress of May 20th, 1826, entitled "An Act to appropriate Lands for the Support of Schools in certain Townships, and fractional Townships, not before provided for." The act thus referred to (4 U. S. Dig. at Large, 179) recites " that to make provision for the support of schools, in all townships or fractional townships for which no land has been heretofore appropriated for that use in those States in which Section No. 16, or other lands equivalent thereto, is by law directed to be reserved for the support of schools in each township, there shall be reserved and appropriated, for the use of schools, in each entire township or fractional township for which no land has been heretofore appropriated or granted for

that purpose," etc. It also provides that when such lands are selected they "shall be held by the same tenure, and upon the same terms, for the support of the schools in such township as Section No. 16 is, or may be held, in the State where such township may be situated." As a further but negative indication of the restriction laid upon the legislative authority of the State over these sixteenth and thirty-sixth sections thus granted, the Act of 1853, in Sec. 12, granting seventy-two sections to the State of California " for the use of a seminary of learning," directs that said lands " are to be disposed of as the Legislature shall direct." This construction is sustained by the judicial construction in our sister States to similar grants made by Congress, and by the enabling acts of Congress upon the same subject.

In Missouri (U. S. Stat. at Large, vol. 3. p. 428, Sec. 6) the sixteenth section in each congressional township was " granted to the State for the use of the inhabitants of every township for the use of schools," etc. The Supreme Court of that State in *Maupin* v. *Parker* (3 Mo. 219 of republication and 310 of the original) decided that the State might authorize the inhabitants to sell the lands as it might an individual (married woman for instance), but " that it cannot direct the fund to any other use than that of schools, but through the legislative body it can make rules to direct in what manner the funds arising from such lands, whether by sale or lease, shall be applied, leaving to the inhabitants of the township always the choice of retaining the land or alienating it. * * But still the money arising from such sale is the property of all the inhabitants of the township, and cannot be by this law divested from the use directed by the Act of Congress." (*Payne and Reggin* v. *St. Louis*, 8 Mo. 640 ; 4 Ala. 622 ; 3 Scam. 585 ; 19 Ark. 308.)

II. The right acquired by said townships eleven and twelve under the Act of April 26th, 1858, became and is a fixed, determinate, vested right ; and in so far as the Act of 1861 attempts to alter and annul that right, by diverting the moneys and interest thereon otherwise due to said townships, it is violative of the clause in the Federal Constitution, which prohibits a State from passing any " law impairing the obligation of contracts."

The fifteenth section of that act provides that " all moneys arising from the sale of land under the provisions of this act, shall be set apart as a permanent school fund, and the interest thereof only appropriated for the support and maintenance of common schools in the township to which the land belonged, from the sale of which the money accrued."

The Act of 1861 repeals (in terms) the Act of 1858, and provides (Sec. 8) that all moneys derived as principal from the sale of the sixteenth and thirty-sixth sections, sold under the provisions of the law of 1858, be paid by the counties respectively into the General School Fund of the State, and that the accruing interest thereon be thereafter applied to the maintenance of common schools throughout the State.

Whether the equitable interest in these sections were, as contended for by respondent, in the said townships, or all right, title, and interest therein were unqualifiedly at the disposal of the Legislature, the legislation of 1858 in the matter was legitimate.    The State thereby ceded to the said townships the said sections, and the proceeds of the interest on the principal to be drawn in a certain fixed mode, whenever the inhabitants of the said townships respectively should take the necessary steps to perfect the grant by such showing as to entitle them to sale, etc., of the land, the sale, payment of the interest, and keeping the school the proper length of time, etc.

The Act of 1858 became and is a grant to said townships, and Parsons (2 Parsons on Cont. 683 and note Z), in commenting upon the clause of the U. S. Constitution heretofore referred to, says : " It seems to be settled conclusively that a grant is a contract— executed, it is true, but still a contract, and that it comes within the scope of this provision ; and, therefore, if there be a grant in itself valid, any law which is or permits a direct interference with the enjoyment of the thing granted, or a diminution of their value, or any deprivation of the things granted, or of the rights or interests belonging to them, by the grantor, impairs the obligation of the contract."    Judge Kent lays down the rule, if anything, stronger than Parsons (1 Kent's Com. 414, margin).    This doctrine was carried to the extent, in the great case of the *Dartmouth*

Wyman v. Banvard.

*College* v. *Woodward* (4 Wheat. 518), of sustaining the inviolability of a grant, even against the change of sovereignty and the violence of revolution. The Act of 1861 does not only impair, when applied to the case at bar, the obligation of the contract, but it destroys it. It takes from said township eleven, three hundred and ninety-six dollars and scatters it broadcast over the State, dividing it *per capita* among the children of the entire State.

CROCKER, J. delivered the opinion of the Court—COPE, C. J. and NORTON, J. concurring.

The question involved in this case relates to the proper construction of the Act of Congress granting the sixteenth and thirty-sixth sections of the public lands to the State of California for school purposes, and the statutes of this State providing for the sale thereof, and the application of the proceeds of such sale. Sec. 6 of the Act of Congress of March 3d, 1853, providing for the survey of the public lands in this State, and for other purposes, provides that all the public lands in the State of California, whether surveyed or unsurveyed, " with the exception of sections sixteen and thirty-six, which shall be and are hereby granted to the State for the purposes of public schools in each township," and with other exceptions, shall be subject to the preëmption laws. The respondent contends that these sections are granted for the purpose of establishing and maintaining public schools in the township where such sections are located, and cannot be used in support of a system of schools common to the whole State. In this he is clearly mistaken. These terms employed in the Act of Congress are an absolute and unconditional grant of all the sections of the public lands in the State numbered sixteen and thirty-six, for a distinct and specified object and purpose, and that is for the purpose of establishing and maintaining " public schools in each township " in the State. Neither the lands nor the proceeds thereof can be used for any other purpose. But Congress did not attempt to impose any conditions or specify or define the mode or manner in which this purpose should be carried into effect. It left that whole subject to the discretion of the Legislature of the State. The grant is made and the purpose specified; that is all. If the Legislature saw fit

to provide that these lands should be sold, and the proceeds placed in one common school fund, the interest on which should be applied equally to the support of all the common schools in each township in the State, there is nothing in the terms of the grant prohibiting them from so doing, but on the contrary the words employed properly sustain that construction. The "public schools" spoken of are not those of the township in which the particular sections are located, but "each township;" that is, each township in the State. The intention of Congress evidently was, that these lands should not be employed to sustain schools in particular portions of the State, leaving other portions destitute of such aid, but should be used to sustain a general system of public schools common to the whole State, and extending to "each township" in the State.

In the earlier grants by Congress of the sixteenth section for school purposes, they were expressly limited to schools within the township in which the section was located. Before the adoption of our National Constitution, Congress, on the twentieth day of May, 1785, passed an ordinance for ascertaining the mode of disposing of lands in the western territory, on which our present land system is mainly founded. Among other provisions it contains the following : "There shall be reserved the lot No. 16 of every township, for the maintenance of public schools *within the said township.*" (1 U. S. Land Laws, 13.) So in the Act of April 30th, 1802, relating to the Territory of Ohio, Sec. 7 granted section number sixteen in every township "*to the inhabitants of such township for the use of schools.*" Again, the Act of March 20th, 1804, relating to the Territory of Indiana, reserved section sixteen in each township "for the support of schools *within the same,*" and when Ohio and Indiana were admitted into the Union it was proposed by the National Government and accepted by them that "section sixteen in every township shall be granted to the inhabitants of such township for the use of schools." A proposition similar in terms was also made to and accepted by the States of Illinois, Missouri, Alabama, and Arkansas.

But the grants made in this form were found to operate not only very unequally, some of the sections being valueless while others were of great value, but to cause much difficulty in executing the

trust. The grants in Ohio and Indiana were directly to "the inhabitants of the township," and in Illinois, Alabama, Arkansas, and Missouri, to "the State, for the use of the inhabitants of such township for the use of schools." Thus the inhabitants of each township were the holders and owners of either the legal or equitable title to the land, and to a great extent the power of disposing of and controlling the property was vested in them, and not in the State. But most of the later grants have been made directly "to the State for the use of schools." Such is the case in the acts relating to the States of Michigan, Wisconsin, Iowa, and Florida. Under these earlier grants it is clear that the sixteenth section, or the proceeds thereof, could only be used for the support of schools in the township where it was located; but the later grants, including that to this State, leaves the State free to adopt such system upon this subject, to be general in its character, as the Legislature shall deem most beneficial to the people.

The construction we have given to the Act of Congress is further sustained by the terms of Sec. 2 of Art. 9 of the Constitution of this State, which was adopted prior to the passage of the Act of Congress. That section provides that "the proceeds of all lands that may be granted by the United States to this State for the support of schools, which may be sold and disposed of," together with other lands and funds, "shall be and remain a perpetual fund, the interest of which, together with all the rents of the unsold lands, and such other means as the Legislature may provide, *shall be inviolably appropriated to the support of common schools, throughout the State.*" Congress made the grant directly to the State, knowing that the latter had made it a part of its fundamental law, and therefore adopted, as its fixed and established policy, the equal distribution "throughout the State" of the interest of its common school fund, to be created from these very lands and other means. If the terms of the grant were doubtful, it would be the duty of the Courts to so construe them as, if possible, to make them harmonize and not conflict with the Constitution of the State.

In the exercise of the power thus vested in them by the Act of Congress and the State Constitution, the Legislature of this State, on the twenty-sixth day of April, 1858, passed an act providing for

the sale of the sixteenth and thirty-sixth sections, and by section fifteen it was provided that all the moneys arising from the sale of these lands should be set apart as a Common School Fund, and that the interest thereof only should be appropriated "for the support and maintenance of common schools *in the township to which the land belonged*, from the sale of which the money accrued." This law established in this State the inequality which necessarily flowed from the earlier grants made by Congress, and its constitutionality may well be doubted. But, by an Act approved April 22d, 1861, and which took effect from and after its passage, the Legislature changed this system, and directed that the interest of the school fund derived from the sale of these sections should be "appropriated for the support and maintenance of common schools *throughout the State.*" Thus the inequality was removed, the law made to conform to the requirements of the Constitution, and all portions of the State are equally benefited by the fund derived from these lands. We see no good reason for declaring this clause of the Act of 1861 unconstitutional. It is clearly in accordance with the terms and the spirit and intent of the Act of Congress making the grant, and with the provisions of the State Constitution. The Act of 1858 was not in the nature of a contract, nor did it confer any vested right to have the interest of the money derived from the sales of these sections perpetually appropriated as therein provided. The Legislature could amend or repeal that law without violating that clause in the National and State Constitutions, prohibiting the Legislature from passing a "law impairing the obligation of contracts." It was, like other statutes, subject to such modifications and changes as the Legislature might deem necessary and proper to make. The Act of Congress, as we have shown, grants the land directly to the State, and not to the townships, or the inhabitants thereof. The latter have no legal or equitable title to the land, and they have, therefore, no interest or estate to be affected by a change of the law. The Act of 1858 is in no sense a grant of the interest money to the several townships, but merely a provision as to the manner in which certain interest money derived from a certain fund shall be appropriated; and is, like any other law appropriating money, subject to the future control of the Legislature.

Under the view we have thus taken of the law, the Court erred in overruling the demurrer to the complaint, as it should have been sustained.

The judgment is therefore reversed, and the Court below is directed to enter an order sustaining the demurrer.